Rose *v.* Bray.

## Opinion delivered January 24, 1927.

1. MORTGAGES—FORECLOSURE—INADEQUACY OF PRICE.—Gross inadequacy of price coupled with any slight circumstances of unfairness in the party benefited by a foreclosure sale will justify the court in refusing to confirm such sale.

2. MORTGAGES—FORECLOSURE—INADEQUACY OF PRICE.—A foreclosure sale under a first mortgage will be set aside where the price paid was inadequate, and the purchaser had promised the second mortgagee and the mortgagor to furnish the money to the second mortgagee to purchase the property at the foreclosure sale, but notified them of the refusal to furnish the money too late for them to secure the money elsewhere.

3. MORTGAGES—FORECLOSURE—ESTOPPEL.—Where a lawyer, employed to collect a second mortgage on land, promised his client to furnish the money to purchase the land at foreclosure of the first mortgage, and failed to notify his client of his refusal to furnish the money until it was too late to secure the money elsewhere, and the client, being unable to procure the money elsewhere, was compelled to assign his certificate of purchase to his lawyer, *held* that the client was not estopped by assignment of the certificate of sale from seeking to set aside the sale.

Appeal from Mississippi Chancery Court, Chickasawba District; *J. M. Futrell,* Chancellor; reversed.

*Shane & Batten,* for appellant.

*Block & Kirsch,* for appellee.

HUMPHREYS, J. This is an appeal from a decree of the chancery court of Mississippi County, Chickasawba District, confirming a commissioner's sale of certain real estate in said county and ordering the commissioner to make a deed to the purchaser thereof, in a foreclosure proceeding wherein B. C. Land Company was plaintiff and appellees herein were defendants. L. W. Rose, one of the appellants, owned the east half of the fractional southeast quarter of section 21, township 16 north, range 8 east, in said district and county, worth between $5,500 and $6,500. He executed a first mortgage thereon to B. C. Land Company for $2,000, and a second mortgage to Mr. Ellis Goodrich for $1,500. He failed to pay the first mortgage at maturity, and the B. C. Land Company

foreclosed same, making L. W. Rose, the owner, and Mrs. Alice Goodrich, the second mortgagee, parties defendant in the proceeding. Pursuant to order, the land was sold on April 11, 1925, to Mrs. Alice Goodrich for $2,246.86, which was about $100 more than was necessary to satisfy the first mortgage, interest and cost. She was unable to give security or bond for the first payment of the bid, and assigned her certificate of purchase to W. G. Bray for W. F. Shelton, Jr., in consideration of $100 cash and the release by W. G. Bray of his claim for an attorney's fee against her. On September 25, 1925, the first day of chancery court subsequent to the sale, appellants filed exceptions to the sale, praying that same be set aside upon the alleged ground that they had been misled and defeated in the protection of their rights at the said sale through misrepresentations and fault of W. G. Bray, who purchased the land either for himself or W. F. Shelton, Jr., at said sale, for a grossly inadequate price, who took possession of the land by force a short time after the sale. They tendered into court a sufficient sum to redeem the land from the sale.

W. F. Shelton, Jr., filed an answer, denying the allegations set out in the exceptions to the sale, and praying for a confirmation thereof and a deed for same.

Appellants contend that the court erred in confirming the sale and ordering the commissioner to make a deed to W. F. Shelton, Jr., under the testimony introduced by them and the rule of law applicable thereto. The rule of law invoked by appellants as applicable to the facts in the instant case is that gross inadequacy of price, coupled with any slight circumstances of unfairness in the conduct of the party benefited by the sale, will justify a court in refusing confirmation thereof. The rule thus announced is supported by the cases of *Wells* v. *Knox,* 108 Ark. 366, 159 S. W. 1099; *Stevenson* v. *Gault,* 131 Ark. 397, 199 S. W. 112; *Hawkins* v. *Jones,* 131 Ark. 478, 199 S. W. 1099; *Moore* v. *McJudkins,* 136 Ark. 292, 206 S. W. 445; *Chapin* v. *Quisenberry,* 138 Ark. 68, 210 S. W. 341.

Appellee introduced no testimony responsive to the issue joined, so the facts revealed by the record must be treated as undisputed. We shall only attempt a summary of the facts bearing upon the integrity of the sale, in announcing our conclusion. W. G. Bray was an active vice president of the bank of Senath, and its attorney. W. F. Shelton, Jr., was a stockholder in said bank. Quite a while before the sale B. A. Goodrich, acting for his wife, Mrs. Alice Goodrich, employed W. G. Bray to collect her second mortgage, and turned the note and mortgage over to him for that purpose. Goodrich contracted with him for an agreed fee of $100 to either get enough money from the bank or to advance enough to purchase the land at the sale and thereby protect his wife's interest until they could borrow the necessary amount from a loan company to repay him. Bray and Goodrich went together to J. C. Chapin to negotiate a loan, and he referred them to his associate, Mr. Kirscher, to whom an application was made for a loan of about $2,500. They informed J. C. Chapin that their plan was for Bray to loan the money to Goodrich, buy the land at the sale, and, after securing the title, to obtain a loan through Kirscher and Chapin. Kirscher and Chapin viewed and appraised the land at $5,500 to $6,000. In February before the sale, Bray or his partner wrote to L. W. Rose to the effect that they had Mrs. Goodrich's note and mortgage for collection. In response to the letter, he called on Bray, who proposed to represent his interest also at the sale, saying that he was going to furnish the money to Mrs. Goodrich to take care of the first mortgage if Rose would renew the second mortgage to Mrs. Goodrich. About ten days before the sale Bray informed Rose that he had decided not to lend Mrs. Goodrich the money to take care of the first mortgage at the sale. Rose then tried to get a loan to take up the first mortgage, but did not have time to complete same before said sale. He was informed by an agent of the B. C. Land Company that he would have a right to redeem the land until court convened in September. He did nothing further, counting on redeeming it at

that time. Having ascertained that he had been misinformed with reference to the redemption of the land, he joined Mrs. Goodrich in filing the exceptions herein to the sale. About ten days or two weeks before the sale Bray informed Goodrich that he had decided not to advance Mrs. Goodrich the money to take care of the first mortgage at the sale, and advised him to buy it in himself for as small an amount as possible, and give a bond to secure the bid. He accepted the advice, believing that Bray was still acting for them in the collection of Mrs. Goodrich's note and mortgage. He bid the land in at the sale for $2,246.86, and produced two bondsmen that he regarded as responsible, but the commissioner refused to accept them, and Bray made no effort to induce him to do so. Being unable to secure his bid to the satisfaction of the commissioner, and coming to the conclusion that he had lost any chance to protect the interest of his wife, he agreed to transfer his certificate of purchase to Bray for $100 in cash and the relinquishment of any claim by him of an attorney's fee. The certificate was transferred to Bray for W. F. Shelton, Jr. Bray told Rose, immediately after the sale, that he had bought the land for himself. Appellants called Bray as a witness, and interrogated him relative to the purchase of the land at the sale for W. F. Shelton, Jr., as follows: "Q. You came over here that day of the sale representing him, didn't you? A. No, sir. Q. Didn't you wire for the money to conduct this sale? A. Yes sir. Q. When you bought the land, you immediately wired Mr. Shelton to get the money to pay for it, didn't you. A. Yes sir. Q. You say to the court that you did not come over intending to buy the land for Mr. Shelton? How did you know he would want it if you didn't? A. We had had more or less dealings since 1902. Some time prior we had a sort of understanding that if I found a bargain in land, to buy it and draw on him for the money and he would pay it. Q. In other words, to buy up all the cheap land you could get, and he would furnish the money to pay for it?

A. There was nothing said about cheap land, about buying up cheap land.''

Shortly after the sale, and before the confirmation thereof, Bray took possession of the land in question by force, and put a man by the name of Coffee in charge thereof.

We think it fairly inferable from the testimony detailed above that Mr. Bray was, in fact, the real purchaser at the sale, notwithstanding the certificate was assigned to him for W. F. Shelton, Jr., without his knowledge and without any specific understanding that he would do so. He had the certificate assigned for the benefit of Shelton on the strength of an old understanding that he would buy land for him if it could be bought at a bargain. Immediately after the sale he told Rose that he had bought the land for himself. He took possession of the land before the confirmation of the sale, by force, and put his own man in charge of it. Treating him, then, as the real purchaser of the land, we do not think he should be permitted to profit by the sale. He bought it for an inadequate consideration from his client, who was in financial distress and who had contracted with him and depended upon him for financial assistance until ten days before the sale. In fact, on the day of the sale, Goodrich followed Bray's advice and bought the land in for a little more than enough to pay the first mortgage. The men he got to secure the bid were refused, and Bray made no effort to get the commissioner to accept them. In trying to arrange matters, Bray had promised Rose to assist him, who relied upon his promise until about ten days before the sale.

We do not think Bray gave Goodrich and Rose sufficient notice that he would not assist them, after promising aid to Rose and contracting to lend Goodrich a sufficient amount of money to protect his wife's interest against the first mortgage. They were unable to make other arrangements in the short time intervening between the notice and the sale. There can be no question about Rose being able to raise a sufficient amount to take up

the first mortgage, had he been given a reasonable time to negotiate a loan. Goodrich should have been given more notice, under the circumstances, to protect his wife's interest, and we do not think he should be estopped on account of the assignment of his certificate of purchase to his lawyer. It is quite clear that he made the assignment on account of financial distress, which could have been avoided, had his attorney given him ample notice that he did not intend to carry out his contract with him.

On account of the error indicated the judgment is reversed, and the cause is remanded for a new trial.